In re CONTINENTAL AIR
LINES, INC., Debtor.

CONTINENTAL AIR LINES,
INC., Plaintiff,

v.

Larry L. HILLBLOM, People of Microne-
sia, Inc., Conrado L.G. Crisostomo,
Trustee, Conrado L.G. Crisostomo, and
Russ Curtis, Defendants.

Larry L. HILLBLOM, People of Microne-
sia, Inc., Conrado L.G. Crisostomo,
Trustee, Conrado L.G. Crisostomo, and
Russ Curtis, Appellants,

v.

CONTINENTAL AIR LINES,
INC., Appellee.

Bankruptcy Nos. 84–04020–H1–5,
83–04019–H2–5, H–85–4034 and
H–85–4183.

United States District Court,
S.D. Texas,
Houston Division.

May 23, 1986.

As Amended May 29, 1986.

Gerald Goldman, Hughes, Hubbard & Reed, Washington, D.C., Leonard M. Parkins, Sheinfeld, Maley & Kay, Houston, Tex., for plaintiff/appellee.

Parker C. Folse, III, Susman, Godfrey & McGowan, Houston, Tex., Peter J. Donnici, Dennis J. Kerwin, Donnici & Lupo, San Francisco, Cal., for defendants/appellants.

## MEMORANDUM AND ORDER

CARL O. BUE, Jr., District Judge.

### I. *Introduction*

This Court is required to determine how far a debtor-in-possession ("debtor")[1] can plumb the depths of the protections afforded by the Bankruptcy Reform Act of 1978 ("the Code"). With this in mind, the underlying question presented for decision is as follows: Is a debtor permitted to enter into a marketplace as any other suitor, free from the restrictions imposed by the Code, to conduct an attempted, post-petition takeover of an independent corporation and, claiming the fruit of its marketplace activity as property of the estate, force the com-

---

1. Debtors-in-possession are automatically given leave to operate their business after the filing of a Chapter 11 petition. Although this opinion consistently refers to Appellee as "debtor," the interplay between sections 1106, 1107, and 1108 makes it clear that the debtor has all of the statutory rights and duties of a trustee in bankruptcy, with a few limited exceptions that are not relevant to the case at bar. Thus, any statutory references to the "trustee" encompasses the duties and rights of Appellee.

plaining shareholders of the target corporation to litigate their claims in the home bankruptcy court, thousands of miles from the situs of the takeover and the residence of the target corporation, while being afforded the plethora of procedural protections customarily accorded to a debtor?

Beginning with the fundamental axiom that the bankruptcy court is a court of equity,[2] this Court holds that under the circumstances of the instant case, the debtor is not entitled to rely upon the automatic stay or the inherent power of the bankruptcy court as a sword against the minority shareholders of the target corporation. Accordingly, the orders of the United States Bankruptcy Court for the Southern District of Texas, ("Bankruptcy Court (Texas)"), entered against Larry L. Hillblom, Appellant,[3] are vacated in their entirety, including the series of preliminary injunctions which culminated in a certification of contempt.

## II. *Factual Background*

Continental Air Lines, Inc. ("Continental") filed a petition in bankruptcy in September of 1983, and is presently conducting its business as a debtor under Chapter 11 of the Code.

Pursuant to route certificates issued by the Civil Aeronautics Board ("CAB") to operate air services in the Pacific Trust Territory,[4] Continental and Air Micronesia, Inc.[5] ("Air Mike") executed a profit sharing agreement in 1973 which provided that the parties were to share equally in net revenues. After the Pacific operations had begun to generate considerable profits, Continental sought to restructure the profit sharing agreement to obtain a greater share of net revenues. When Air Mike refused to accept the proposed terms, Continental designed a structured transaction to seize control of the United Micronesian Development Association ("UMDA"),[6] the controlling shareholder of Air Mike, so that it could compel Air Mike to restructure the profit sharing agreement commensurate with its prior demands.

At the time of filing bankruptcy, Continental was a substantial minority shareholder of UMDA, owning approximately 23% of the shares. Hillblom, a resident of the Northern Mariana Islands, is the principal shareholder of People of Micronesia, Inc. ("POM"), which is also a substantial minority shareholder of UMDA.

Faced with a forty percent limitation on non-Micronesian ownership imposed by

**2.** Case law suggests that there is a broad sense of equity and fiduciary duty which pervades the entire bankruptcy administration. *See, e.g., In re Beck Indus., Inc.,* 605 F.2d 624, 634 (2d Cir. 1979) ("We need not belabor the point that a bankruptcy court sits as a court of equity.")

**3.** The certification of contempt entered against Appellant, Hillblom, is the most pressing issue before this Court on appeal. However, to the extent that the other named Defendants are shareholders of the United Micronesian Development Association, and only to that extent, they are free to join in the cause of action filed by Hillblom in the United States District Court for the Northern Mariana Islands ("N.M.I.").

**4.** Companion Certificates of Public Convenience and Necessity were simultaneously issued to Continental and Air Micronesia, Inc. (171 and 170) to be effective August 28, 1976. Continental's service was authorized subject to the following term, condition, and limitation:
(5) The holder shall not engage in air transportation authorized herein until it files with the Board, and the Board approves, all exe-

cuted agreements between the holder and Air Micronesia, Inc. Any amendments to such agreements shall be filed with the Board for approval.
Continental was originally selected over competing air carriers based upon representations before the CAB that it intended to develop an independent, viable, locally owned air line servicing the trust territory. To the extent that Continental desires to obtain a variance from the terms, conditions, and representations upon which it is authorized to provide services to the Trust Territory, it must obtain approval from the DOT.

**5.** Air Micronesia, Inc. is a Nevada corporation which is owned as follows:
10%—Aloha Air Lines, Inc.
30%—Continental
60%—United Micronesian Development Association

**6.** Although the parties dispute the residence of UMDA, the Bankruptcy Court (N.M.I.) has found that UMDA is a corporation of the Northern Mariana Islands.

UMDA's Articles of Incorporation, and governmental curtailment of trading in the target's shares, Continental opened negotiations with the Federated States of Micronesia ("F.S.M."), which culminated in a Statement of Principles that would have entitled Continental to the net revenues it was seeking, while placing the indicia of ownership of UMDA in the F.S.M.

Some months after Continental petitioned for bankruptcy under Chapter 11 in Houston, Hillblom filed a lawsuit in the United States District Court for the Northern Mariana Islands, both individually and derivatively as a shareholder of UMDA, which charged various defendants including Continental with violations of federal and state law arising from Continental's post-petition takeover attempt. In response, Continental obtained a series of preliminary injunctions from the Bankruptcy Court (Texas) which prevented Appellants from continuing their lawsuit.

In the meantime, Hillblom had not been idle. He caused POM to file bankruptcy, and the United States Bankruptcy Court for the Northern Mariana Islands ("Bankruptcy (N.M.I.)") entered a declaratory judgment against UMDA which holds that actions taken by UMDA while under the domination of Continental were unlawful and against public policy. Moreover, the N.M.I. Court issued a permanent injunction which prevents consummation of certain stock transactions designed to wrest control of UMDA. Meanwhile, back in the United States, Continental obtained a certification of contempt from the Bankruptcy Court (Texas), which found that POM's Chapter 11 filing was a "sham," that the

N.M.I. judgments are "null and void," and ordered Hillblom to vacate said judgments upon pain of substantial monetary penalties.

Continental has terminated its interest in the Statement of Principles and has entered into another agreement with the F.S.M. which proposes the creation of a new corporation, and abandons its prior business relationship with Air Mike. The new agreement contemplates the elimination of Air Mike as a potential competitor by obtaining certificate authority from the Department of Transportation ("DOT") to serve the same area previously served by Continental-Air Mike.

Continental filed a motion in the Bankruptcy Court (Texas) seeking approval of its new agreement with the F.S.M. as well as a motion to reject interfering obligations to Air Mike. Contemporaneously, Continental filed objections to a proof of claim filed in 1984 by Air Mike and also filed a counterclaim. Testing the full range of the concept of "jurisdiction by ambush," [7] Continental named as counterclaim defendants not only Air Mike, but also Hillblom, Aloha, and UMDA, which have never filed claims against the estate. The "counterclaim" seeks a declaratory judgment that Continental is "not indebted or liable to Air Mike, UMDA, Aloha or Hillblom for any amount on any claim."

To date, Continental has successfully precluded Appellants from adjudicating their claims in another forum, while it has professed that it is awaiting "the required 363(b) hearing" [8] in connection with the

---

7. "Jurisdiction by ambush" rests upon the doctrine of consent. Thus, it has been held that a creditor, by filing a proof of claim, waives objections to the jurisdiction of the bankruptcy court, which may then hear any counterclaims asserted by the debtor. Subsequent to the Supreme Court's opinion in *Marathon,* and the 1984 amendments to the Code, there has been a fundamental split of opinion on this issue. *Comp. Baldwin-United Corp. v. Thompson,* 48 B.R. 49 (Bankr.S.D.Ohio 1985) (by filing proof of claim creditor consents to jurisdiction of bankruptcy court), *with, In re Nanodata Computer Corp.,* 52 B.R. 334 (Bankr.W.D.N.Y.1985) (holding that bankruptcy court does not acquire jurisdiction over the debtor's counterclaim for breach of contract by the creditor's filing of a proof of claim). While *Nanodata* appears to take the better reasoned position, this issue need not be reached here since Appellants have not even filed a proof of claim against Continental's estate.

8. Continental's position is that the lawsuit filed by Appellants in the N.M.I. represents a preemptive attack upon the Bankruptcy Court's exclusive jurisdiction to hear all related claims arising from Continental's proposed "restructuring" of Air Mike pursuant to a 363(b) hearing. Thus,

Statement of Principles. Continental's avowed purpose in filing for declaratory relief is to obtain a binding judgment against all parties interested in the survival of Air Mike which exonerates it from liability. Thus, Continental has attempted to force Appellants to litigate their claims filed in the N.M.I. in the forum of its choice (Texas) upon threat that the failure to do so would preclude subsequent litigation under the doctrine of *res judicata.*

### III. *Procedural History*

Continental has filed six adversary proceedings[9] in the Bankruptcy Court (Texas) arising out of disputes between the parties over Continental's Pacific operations. The first five proceedings were initiated for the purpose of restraining the named defendants from engaging in litigation outside of the Bankruptcy Court (Texas) or from engaging in stock transactions which Continental alleged would interfere with its attempts to "restructure" its operations in the Trust Territory. The sixth proceeding was filed for the purpose of forcing defendants to litigate their N.M.I. claims in the Bankruptcy Court (Texas).

The defendants in each of the adversary proceedings have filed dispositive motions, including motions to dismiss, motions to transfer venue, and motions for withdrawal of reference. Several of the preliminary injunctions entered by the Bankruptcy Court (Texas) are the subject of appeals now pending in this district.[10]

With "one eye cocked toward the decision of the Supreme Court in *Northern Pipeline Constr. v. Marathon Oil Pipe Line Co.,* ... which is the progenitor of the new bankruptcy court jurisdictional scheme," *Holland America Insurance Co. v. Union Bank & Central Pecan Shelling Co., Inc.,* 777 F.2d 992, 998 (5th Cir.1985), this Court withdrew the reference of the six adversary proceedings from the Bankruptcy Court.[11]

### IV. *Jurisdiction and Venue*

Appellants have strongly resisted the Bankruptcy Court's assertion of personal and subject matter jurisdiction, and additionally argue that venue is improper in this district. Consequently, they have taken no steps to assert their claims in the Bankruptcy Court (Texas). As an initial matter, therefore, this Court will address the parties' positions regarding jurisdiction and venue.

### A. *Subject Matter Jurisdiction*

Appellants' contention that the Bankruptcy Court (Texas) lacks subject matter jurisdiction need not detain this Court for long. Although the Supreme Court invalidated the jurisdictional scheme established by Congress in 1978, the Code significantly expanded the jurisdiction of the bankruptcy

---

Appellee erroneously equates a non-existent exclusive jurisdiction "to hear" proceedings with this district's exclusive jurisdiction over the property of the debtor's estate.

**9.** *Continental v. Skinner,* No. 83–2408–H3; *Continental v. Hillblom,* No. 85–0157–H2; *Continental v. Aloha Air Lines,* No. 85–01310–H3; *Continental v. Air Micronesia,* No. 85–0444–H2; *Continental v. UMDA,* No. 85–4548; *Continental v. Air Micronesia,* No. 85–0759–H1.

**10.** Arising from the six adversary proceedings, the following related appeals were transferred to this Court in accordance with Local Rule 14(E), Local Rules of the United States District Court for the Southern District of Texas: C.A. No. H–85–4548; C.A. No. H–85–6432; C.A. No. H–85–6431; C.A. No. H–85–4351; C.A. No. H–85–4183.

**11.** This Court concluded that if it did not withdraw reference it would only see the same law-

suit in the future on a *de novo* review because the Bankruptcy Court cannot dispositively rule in these "related" proceedings. Several adversary proceedings filed by Appellee are grounded upon motions to enforce the automatic stay, and thus are "core" proceedings. Nevertheless, Appellee's declaratory judgment counterclaim not only sets forth a collateral attack upon a final judgment entered by the Bankruptcy Court (N.M.I.), but immediately puts into issue the claims asserted by Appellants in the District Court (N.M.I.). Moreover, withdrawal of reference was mandated because a substantial and material consideration of "both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce" is required. 28 U.S.C. § 157(d). Finally, this Court determined that Appellants are entitled to a jury trial.

court.[12] *See Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). At the heart of the Supreme Court's invalidation of 28 U.S.C. § 1471 was the plurality's concern about the exercise of Article III powers by the bankruptcy court in the absence of Article III safeguards. Also, the Court expressed concern about the bankruptcy court's role in the underlying proceedings in light of their peripheral relationship to substantive bankruptcy law. The current distinction in the bankruptcy court's role in core versus non-core proceedings represents the essence of the jurisdictional scheme enacted by Congress in the wake of *Marathon. See In re Lion Capital Group*, 46 B.R. 850, 852 (Bankr.S.D.N.Y.1985). Consequently, the present jurisdictional scheme is responsive to the concerns expressed in *Marathon*, but the Bankruptcy Amendments Act of 1984 did not revive the limited jurisdictional concepts of pre-Code law.

The district court now has federal bankruptcy jurisdiction, should it elect to exercise it. *Carlton v. BAWW, Inc.*, 751 F.2d 781 (5th Cir.1985). District courts are permitted to refer title 11 cases and all civil proceedings arising under, arising in, or related to the title 11 case to bankruptcy courts, *see* 28 U.S.C. § 157(a), which are no longer constituted as independently created bodies, but are adjuncts of the federal district court. *See In re Lion Capital Group*, 46 B.R. at 858. Pursuant to a blanket order of reference in effect in this district, the Bankruptcy Court (Texas) has subject matter jurisdiction over core and non-core proceedings, subject to a system of safeguards including the withdrawal of reference.

Against this jurisdictional backdrop, Appellants urge this Court to adopt the position expressed in *Uranga v. Geib (In re Paso del Norte Oil Co.)*, 755 F.2d 421 (5th Cir.1985), which held that the bankruptcy court, as a court of limited jurisdiction, lacked subject matter jurisdiction over a collateral dispute between third parties. To the extent that *Uranga v. Geib* rests on pre-Code law, it does not assist Appellants here. The 1984 Amendments did not undertake a radical restructuring of the system of bankruptcy adjudication enacted by the Code. Rather, the current amendments must be interpreted in light of the original legislative goals of the Code, with *Marathon* in mind. Appellants argue that the Bankruptcy Court (Texas) has committed gross jurisdictional excesses, but this Court remains unpersuaded that the key issue on appeal is lack of subject matter jurisdiction. Upon referral, the Bankruptcy Court exercises broad jurisdiction over related proceedings,[13] and unquestionably has the inherent authority to enjoin the continuation of collateral disputes which significantly impact upon the reorganization process.

### 1. Exclusivity of Jurisdiction: Coleman America Reconsidered

Continental attempts to bolster its case for exclusivity of jurisdiction by citing this

---

**12.** The 1984 amendments to title 28 revised 28 U.S.C. § 1471 to the extent that jurisdiction is now vested in the district court. However, the relevant provisions of 28 U.S.C. § 1334(b) and (d) were copied nearly verbatim from former section 1471. The reason for the expansion in jurisdiction is explained in the Senate Report on the Bankruptcy Reform Act which states: "A major impetus underlying this reform legislation has been the need to enlarge the jurisdiction of the bankruptcy court in order to eliminate the serious delays, expense and duplications associated with the current dichotomy between summary and plenary jurisdiction." S.Rep. No. 95–989, 95th Cong., 2d Sess., *reprinted in* 1978 U.S.Code Cong. & Ad. News 5787, 5803.

**13.** Related proceedings are proceedings which have some logical nexus to the bankruptcy case. The Third Circuit has defined the test for determining whether proceedings are "related" as follows: "whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy ... if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) ...," related proceedings are involved. *In re Bobroff*, 766 F.2d 797 (3d Cir.1985), *quoting, Pacor v. Higgins*, 743 F.2d 984 (3d Cir.1984).

Court to 28 U.S.C. § 1334(d), and through reliance upon pre-Code cases. *See, e.g., Fidelity Mortgage Investors v. Camelia Builders, Inc.,* 550 F.2d 47, 53 (2d Cir. 1976). To the extent that the underlying orders are premised upon exclusivity of jurisdiction, however, they overlook the applicable jurisdictional provisions of title 28.

The opposing viewpoints regarding exclusivity of jurisdiction were first set forth in the companion cases in *In re Coleman American Co., Inc,* 6 B.R. 251 (Bankr.D. Colo.1980); 8 B.R. 384 (Bankr.Kan.1981). In those proceedings, the Kansas Bankruptcy Court held that it had exclusive jurisdiction to lift the automatic stay, while the Colorado Bankruptcy Court, after analyzing the relevant venue provisions of title 28, determined that Congress did not intend to grant jurisdiction over all bankruptcy matters only to the court in which the title 11 case was commenced. Thus, the Colorado court refused to dismiss a motion to lift the automatic stay premised upon lack of subject matter jurisdiction.

■ The presently accepted view is that 28 U.S.C. § 1471(e), reenacted as 28 U.S.C. § 1334(d) was intended to emphasize the end of the distinction between plenary and summary jurisdiction, and to establish both *in personam* and *in rem* jurisdiction, rather than to establish exclusivity over bankruptcy matters in the reorganization court.[14] The exclusivity argument is unpersuasive because it would render the venue provisions of title 28 virtually meaningless. Exclusivity could mean, as it would in the instant case, that venue would not be proper in the only district with subject matter jurisdiction (Texas), while venue would be proper in a district which lacks jurisdiction, (N.M.I.). Congress could not possibly have intended such a result when fashioning the jurisdiction and venue provisions of title 28. The better reasoned position is that the "Code and the amendments to title 28 envisioned a national bankruptcy court system. Jurisdiction in one bankruptcy [district] court is jurisdiction in all." *In re Coleman American,* 6 B.R. at 253.

### 2. *Jurisdiction in the Northern Mariana Islands: Marathon Reconsidered*

■ With the case in this posture, this Court takes note of the Supreme Court's conclusion in *Marathon* that the legislative, territorial courts were outside the pale of its holding. Thus, Congress need not provide an Article III court for the adjudication of bankruptcy proceedings in the United States' territories. Pursuant to the explicit grant of federal bankruptcy jurisdiction, which was undisturbed by the 1984 Amendments to the Code, *see* 28 U.S.C. § 152(a)(4), the Article I District Court (N.M.I.) possesses concurrent jurisdiction with this district to determine the scope and applicability of the automatic stay, and it is competent to decide the issues in the case before it. *See* S.Rep. No. 95–475, 95th Cong., 1st Sess. (1977), *reprinted in* 1977 U.S.Code Cong. & Ad. News 3307.[15]

---

**14.** 28 U.S.C. § 1334(d) tracks the language of former section 28 U.S.C. § 1471(e) and provides as follows:

(d) The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction of all of the property, wherever located, of the debtor as of the commencement of such case, and of the estate.

Referring to *In re Coleman American Co.,* Collier states: "The Kansas decision, based as it was on former 28 U.S.C. § 1471(e), ignored the provisions of former 28 U.S.C. § 1471(b) and is patently incorrect." 1 *Collier on Bankruptcy* ¶ 3.02 n. 19 (15th ed. 1985) (hereinafter *"Collier"*).

**15.** Far from being incapable of receiving federal question jurisdiction, the territorial courts, though Article I courts, have continued their long exercise of jurisdiction commensurate with the jurisdiction of regular federal courts, and "are competent to decide cases arising under the Constitution and laws of the United States." *Meaamaile v. American Samoa,* 550 F.Supp. 1227, 1235–36 (D.Haw.1982), *citing Benner v. Porter,* 50 U.S. (9 How.) 235, 13 L.Ed. 119 (1850). Moreover, as distinguished from *Chase Manhattan Bank v. South Acres Development Co.,* 434 U.S. 236, 98 S.Ct. 244, 54 L.Ed.2d 501 (1978), in which the Court determined that the District Court of Guam could not exercise diversity jurisdiction because Congress had neither explicitly nor impliedly granted diversity jurisdiction to that court, Congress here has explicitly provided for the exercise of federal question jurisdiction, and impliedly provided for the ex-

### 3. *The Clash of Jurisdiction*

Since this Court is required to afford the final judgments entered by the Bankruptcy Court (N.M.I.) full faith and credit, *see* 28 U.S.C. § 1738, this district is presented with the unfortunate situation contemplated by the Second Circuit in *In re Baldwin-United Corp. Litigation,* 765 F.2d 343, 347 n. 2 (2d Cir.1985). The Second Circuit expressly rejected the debtor's argument that the reorganization court possessed exclusive jurisdiction to determine the applicability of the automatic stay, and then stated: "Arguably, affirmance of the contempt might then mean that a creditor can be held in contempt by a bankruptcy court for violating a stay, even if the forum in which the violation occurred believed that the stay did not apply." *Id.*

█ The record in the instant appeal indicates that the N.M.I. Court was fully apprised of the automatic stay and the series of preliminary injunctions, ostensibly grounded in the automatic stay, which are at issue in this case. The judgments entered must therefore reflect that Court's independent assessment that the automatic stay did not apply to the proceedings before it. Since the underlying orders of the Bankruptcy Court (Texas) are vacated, however, this Court does not reach the issue of whether Hillblom may be held in contempt for violating the automatic stay when a court with concurrent jurisdiction has made an independent assessment that the automatic stay provisions are inapplicable.[16]

### B. *In Personam Jurisdiction*

A question of jurisdiction over the person has been raised by Appellants. Although Continental cites an impressive host of authorities in opposition,[17] this issue warrants some observations. In *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982), the Supreme Court held that the exercise of personal jurisdiction was not a function of sovereignty, and explained afresh the principles expressed in *Shaffer v. Heitner,* 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977). The Court stated: "The personal jurisdiction requirement recognizes and protects an individual liberty interest. It represents a restriction on judicial power, not as a matter of sover-

ercise of diversity jurisdiction pursuant to the venue provisions of 28 U.S.C. § 1409(d)(e).

16. The Bankruptcy Court's (Texas) Orders directing Hillblom to vacate final judgments of the Bankruptcy Court (N.M.I.) appear to skirt the limitations of 28 U.S.C. § 1481. It may be argued that the conflicting provisions of the Bankruptcy Amendments Act of 1984 leave 28 U.S.C. § 1481 a nullity since section 113 of that Act provides that section 1481 "shall not be effective," whereas section 121 of that same Act provides that section 1481 "shall be effective." Regardless of whether 28 U.S.C. § 1481 retains any remaining vitality, the bankruptcy judge does not have authority under the 1984 Amendments to "enjoin another court." While the orders of the Bankruptcy Court (Texas) do not purport to "enjoin another court," they have repeatedly directed Appellants to make decisions or take actions which are entirely within the discretion of the N.M.I. Court.

17. *See, e.g., Securities Investor Protection Corp. v. Vigman,* 764 F.2d 1309, 1315 (9th Cir.1985); *Waffenschmidt v. MacKay,* 763 F.2d 711, 722–23 (5th Cir.1985); *Johnson Creative Arts, Inc. v. Wool Masters, Inc.,* 743 F.2d 947 (1st Cir.1984) ("If a person is served *within* the territory of the sovereign represented by the issuing court, there is no question that maintenance of the suit against him will not offend traditional notions of fairness.") (emphasis in original); *Trans-Asiatic Oil, Ltd., S.A. v. Apex Oil Co.,* 743 F.2d 956 (1st Cir.1984), and *Piper Acceptance Corp. v. Slaughter,* 600 F.Supp. 169 (D.Colo.1985). *Waffenschmidt,* upon which Continental places primary reliance on appeal, is but one example of the citation of authority that indicates the "humpty dumpty" world which this Court has traversed in analyzing the applicable law. While *Waffenschmidt* unequivocally stands for the proposition that the district court has inherent authority to enforce its own injunctive decrees against non-residents, who have aided and abetted in the perpetration of securities fraud by knowingly participating in a violation of the Court's order, Continental reverses the tables in the instant proceedings by attempting to rely upon this district's injunctive power as a shield to avoid answering to securities fraud charges pending in another district, and to protect assets allegedly taken by fraud. Thus, while relying upon *Waffenschmidt,* Appellee conveniently ignores the fact that *it* is the alleged perpetrator of securities fraud at issue in the N.M.I. proceedings.

eignty, but as a matter of individual liberty." *Id.*, 456 U.S. at 702, 102 S.Ct. at 2104.

Prior to the Court's decision in *Insurance Corp. of Ireland,* it was generally considered that the Fourteenth Amendment treated the states as sovereigns and placed externally imposed limits on their power to adjudicate disputes involving interests outside of their own territories. The "minimum contacts" standard provided a vehicle for balancing conflicting interests when states attempted to exercise extraterritorial jurisdiction. *See International Shoe Co. v. State of Washington,* 326 U.S. 310, 324, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

To the extent that the "minimum contacts" standard survives *Insurance Corp. of Ireland* as a concept that is grounded upon notions of territorial limitations on the power of particular states, *see De Melo v. Toche Marine, Inc.* 711 F.2d 1260, 1270 (5th Cir.1983), it appears to be irrelevant in a federal question case, such as the one *sub judice,* when evaluating the validity of jurisdiction that is asserted territorially, since all citizens obviously have such contacts with the sovereign. *See GRM v. Equine Investment & Management Group,* 596 F.Supp. 307 (S.D.Tex.1984); *Bamford v. Hobbs,* 569 F.Supp. 160, 164–67 (S.D.Tex.1983).

■ In contrast to the fifty states, the United States is a unitary sovereign with respect to its own constitutional power to legislate in most areas and with respect to regulating uniformly across state lines. Thus, it has long been held that there is nothing in the Constitution which forbids Congress from enacting a statute which authorizes service anywhere in the United States as to a class of cases, or a case of a special character. Accordingly, federal forums everywhere have the power to bring before them the parties necessary to their decisions.[18]

Bankruptcy proceedings have long held a special place in the federal system due to their importance to the smooth functioning of the nation's commercial activities, and the shared interest of the several states in furthering the fundamental substantive policies of bankruptcy. These strong federal interests, however, are not easily reconcilable with notions of fundamental fairness due individual defendants. This inherent tension between the goals of substantive bankruptcy law and those of constitutional fairness is particularly acute here since a plain reading of the Code indicates that the strong federal concerns of bankruptcy are not without limitation. In the case at bar, a minimal inquiry suggests, unlike in *Waffenschmidt,*[19] that there is no real link between the substantive policy goals of the Code and the decision to exercise personal jurisdiction over Appellants.

*Insurance Corp. of Ireland* seemingly accommodates Appellants' argument that Fifth Amendment fairness concerns survive the authorization of nationwide service of process and continues to place some limits on the judicial power of the United States.[20] Thus, they argue that the consti-

---

**18.** *See, e.g., United States v. Union Pacific Railroad,* 98 U.S. 569, 8 Otto 569, 25 L.Ed. 143 (1878); *Robertson v. Railroad Labor Board,* 268 U.S. 619, 45 S.Ct. 621, 69 L.Ed. 1119 (1925) ("Congress clearly has the power to authorize a suit under federal law to be brought in any inferior federal court. Congress has power, likewise, to provide that the process of every district court shall run into every part of the United States.").

**19.** In the cases relied upon by Appellee, fundamental fairness appears to have been satisfied, apart from any minimum contacts analysis, via a direct link between the federal interest at stake and purposeful activity undertaken in contravention of that interest with foreseeable effects either intended by or resulting from such

activity. In *Waffenschmidt,* 763 F.2d at 722–23, for example, the Fifth Circuit upheld the adjudication of contempt, even though the defendants had no other contacts with the forum, because the exercise of personal jurisdiction was linked to the non-parties' knowing engagement outside of the court's territory in activities that dissipated assets acquired through securities fraud.

**20.** In *Bamford v. Hobbs,* 569 F.Supp. at 167, for example, the court stated:

the rejection of sovereignty as a basis for in personam jurisdiction by the Supreme Court in *Insurance Corp. of Ireland,* means there is no compelling reason for this court to "equate fair play and substantial justice" with minimum contacts with the United States. Wheth-

tutional provision for nationwide service of process pursuant to Bankruptcy Rule 7004, *see Creditors' Committee of Park Nursing Center, Inc. v. Samuels* (*In re Park Nursing Centers, Inc.*) 766 F.2d 261 (6th Cir.1985), merely establishes a vehicle for the exercise of jurisdiction which is free from the vagaries of state law, while Fifth Amendment analysis retains its vitality. *See GRM v. Equine,* 596 F.Supp. at 307; *Bamford v. Hobbs,* 569 F.Supp. at 164; *Lapeyrouse v. Texaco, Inc.,* 693 F.2d 581 (5th Cir.1982). However, this Court stops short of determining the constitutional issue because it assumes, without deciding, that the fairness factors identified in *Bamford* and *Lapeyrouse* are primarily related to the fairness of imposing the burdens of litigating in a particular forum and therefore are more appropriately used, at least here, in determining whether venue is proper in this district. *See, e.g., Trans-Asiatic Oil Ltd., S.A. v. Apex Oil Co.,* 743 F.2d at 959, *citing, FTC v. Jim Walter Corp.,* 651 F.2d 251, 256 (5th Cir.1981); *Fitzsimmons v. Barton,* 589 F.2d 330, 334 (7th Cir.1979). *See also In re WWG Indus., Inc.,* 44 B.R. 287, 290 (N.D.Ga.1984).

### C. *Venue*

To complete the jurisdictional and venue picture, this Court takes note of the applicable venue provisions governing the instant proceedings. Appellants contend that venue is improper in this district, and

er it is fair and substantially just for a court to exercise jurisdiction over a particular defendant when nationwide service of process is permitted should be decided on a different basis.
*Id.*

**21.** 28 U.S.C. § 1409(a) provides as follows:
(a) Except as otherwise provided in subsections (b) and (d), a proceeding arising under title 11 or arising in or related to a case under title 11 may be commenced in the district court in which such case is pending.

**22.** 28 U.S.C. § 1409(e) provides as follows:
(e) A proceeding arising under title 11 or arising in or related to a case under title 11, based on a claim arising after the commencement of such case from the operation of the business of the debtor, may be commenced against the representative of the estate in such case in the district court for the district where the State

that a transfer of venue is appropriate for the convenience of the parties and in the interest of justice. Appellee argues, on the other hand, that the venue provisions established by 28 U.S.C. § 1409(d) have no relevance to the dispute between the parties, or, if they do, that its causes of action against Appellants arose in Texas where the proceedings were filed.

### 1. *General Venue Provisions Governing Bankruptcy Proceedings*

The venue of proceedings "arising under title 11 or arising in or related to a case under title 11" is governed by 28 U.S.C. § 1409. Except for the substitution of the district court for the bankruptcy court in the laying of venue, 28 U.S.C. § 1409(a) [21] is virtually identical to its predecessor, 28 U.S.C. § 1473(a). Subsections 1409(a) and (e) [22] do not establish exclusive venue positions. Plaintiffs are *permitted* to assert their claims against the debtor, as the representative of the estate, in the district where the title 11 case is pending, since it is presumptively fair for a debtor to defend suit in such district. However, pursuant to 1409(e),[23] plaintiffs may properly select a wider choice of forums consistent with the purposes of applicable nonbankruptcy venue provisions.

Unlike the permissive or alternate venue provisions of subsections 1409(a) and (e),

or Federal court sits in which the party commencing such proceeding may, under applicable nonbankruptcy venue provisions, have brought an action on such claim, or in the district court in which such case is pending.

**23.** Although it may be argued that the claims at issue did not arise from the "operation of the debtor's business" within the meaning of the venue statute, for the purposes of this order, this Court adopts Continental's position advanced in its Application for Approval of an Agreement Regarding Payment of Legal Fees and Reimbursement of Expenses Incurred by the Government of FSM, which states that the debtor entered into the Statement of Principles in the "operation and management" of its business in the Trust Territory. A contrary interpretation would, of course, result in an even more tenuous connection between Continental's claims against Appellants and the purposes of the Bankruptcy Code.

the venue provisions of subsection (d)[24] are exclusive. Thus, a debtor *must* look to applicable nonbankruptcy venue provisions to determine proper venue, even for those proceedings which otherwise arise in or arise under title 11, if its claims arose subsequent to the filing of the bankruptcy petition.

■■■ In carrying on its business *after* the filing of bankruptcy, the presumption in favor of venue in the home bankruptcy court[25] dissipates, and the debtor is exposed to liability in any court where the controversy might be heard as if the debtor were an ordinary citizen. Although the home court possesses inherent equitable power to enjoin proceedings in another forum when it is essential to preserve its own jurisdiction, a proper exercise of such power is premised upon similar considerations which underlie the doctrine of *forum non conveniens.* At the same time, the general rule, which recognizes that all claims should be expeditiously resolved in a single forum, yields when claims arise post-petition which are not dischargeable in bankruptcy.

The problem at this point stems from the debtor's attempt to subsume litigation which is "truly civil litigation in the historic sense" within an extraordinary "administrative" proceeding, while disregarding the apparent limitations imposed by the venue provisions of title 28. Thus, this Court faces yet another novel issue: May a bankruptcy court exercise its inherent powers in contravention of a defendant's statutorily provided venue rights to accommodate a debtor's post-petition claims?

### 2. *The Function of Venue in a Federal Question Case*

In *Leroy v. Great Western United Corp.,* 443 U.S. 173, 180, 99 S.Ct. 2710, 2714, 61 L.Ed.2d 464 (1979), the Supreme Court discussed the function of venue in a federal question case, and stated that "the purpose of statutorily specified venue is to protect the *defendant* against the risk that a plaintiff will select an unfair or inconvenient place of trial." *Id.* at 183–84, 99 S.Ct. at 2716–17 (emphasis in original). Although the claim in *Leroy v. Great Western* had only "one obvious locus," the Supreme Court recognized that Congress did not intend to provide for venue at the residence of the plaintiff in a nondiversity case or to give the plaintiff an unfettered choice among a host of different districts. *Id.* at 185, 99 S.Ct. at 2717. Thus, in an unusual case, in which the claim did not arise in one

---

24. 28 U.S.C. § 1409(d) provides as follows:

(d) A trustee may commence a proceeding arising under title 11 or arising in or related to a case under title 11 based on a claim arising after the commencement of such case from the operation of the business of the debtor only in the district court for the district where a State or Federal court sits in which, under applicable nonbankruptcy venue provisions, an action on such claim may have been brought.

Although the word "trustee" is used in 28 U.S.C. § 1409(d), and "representative of the estate" is used in 28 U.S.C. § 1409(e), the reason for the difference in statutory language is unclear. In any event, the statute encompasses suits filed by and against "debtors-in-possession." *See* 11 U.S.C. § 1107.

25. The presumption favoring venue in the home bankruptcy court is primarily related to the "prime objective" of bankruptcy which "remains the simple one of getting creditors paid." *In re Grayson-Robinson Stores, Inc.,* 320 F.2d 940, 949 (2d Cir.1963). At this point it is important to distinguish between those adversary proceedings which are "administrative" and those which

are "non-administrative" or truly civil litigation in the historic sense. For a discussion of the distinction, *see* 1 *Collier* ¶ 3.02, at 3–87. Administrative litigation, which historically pertains to "matters of an administrative character including questions between the bankrupt and his creditors which are presented in the ordinary course of the administration of the bankrupt's estate," *Taylor v. Voss,* 271 U.S. 176, 46 S.Ct. 461, 70 L.Ed. 889 (1926), is properly handled in a single, centralized forum, but this relates to those administrative matters which can *only* be heard in the home bankruptcy court. Although venue in the home court may be irreconcilable with the competing purposes of the laws of personal jurisdiction, and therefore disadvantageous to a particular litigant, the presumption is premised upon the principle that it affords all creditors a better opportunity to have their day in court. On balance, matters pertinent to the adjustment of the debtor-creditor relationship, which are therefore crucial to the goal of paying the debtor's creditors, should be handled quickly by a specialized adjunct court.

specific district, the Court concluded that "a plaintiff may choose between those two (or conceivably even more) districts that with approximately equal plausibility—in terms of the availability of witnesses, the accessibility of other relevant evidence, and the convenience of the defendant (but *not* of the plaintiff)—may be assigned as the locus of the claim." *Id.* Ultimately, the Supreme Court rejected the Fifth Circuit's reasoning, "for it would leave the venue decision entirely in the hands of the plaintiff, rather than making it 'primarily a matter of convenience of litigants and witnesses.'" *Id.* at 186–87, 99 S.Ct. at 2718–19.

■ The Supreme Court's decision in *Leroy v. Great Western* indicates that the general function of venue is to regulate the forum in which a party may appear or may force another to appear personally in a suit in which the Court would otherwise have jurisdiction.[26] Those courts which have declined to import fairness factors into the Fifth Amendment context have stressed the importance of applicable venue provisions. *See, e.g., Fitzsimmons v. Barton,* 589 F.2d at 334. When the contours of amenability are fluid, such as in a federal question case, venue statutes should be strictly interpreted in favor of defendants. *See Leroy v. Great Western,* 443 U.S. at 184 n. 18, 99 S.Ct. at 2717 n.18, *citing Olberding v. Illinois Central R. Co.,* 346 U.S. 338, 340, 74 S.Ct. 83, 85, 98 L.Ed. 39 (1953) ("The requirement of venue is specific and unambiguous; it is not one of those vague principles which, in the interest of some overriding policy, is to be given a 'liberal' construction.")

■ Bankruptcy courts have recognized that the broad power over persons located throughout the United States must be tempered by liberally reading change of venue provisions. *See, e.g., Chemical Bank v. Grisby's World of Carpet, Inc., (In re WWG Industries, Inc.),* 44 B.R. 287, 290 (N.D.Ga.1984), *citing, In re Advent Corp.,* 20 B.R. 561 (Bankr.D.Mass.1982). Apart from any fairness analysis in the Fifth Amendment context, Congressional intent in enacting subsection 1409(d) may not be lightly brushed aside. Moreover, cases which have dealt with the mandatory venue provisions of subsections (b) and (d) have strictly interpreted those subsections. *See, e.g., Cristol v. Western Book Distributors (In re Schear & Associates, Inc.),* 47 B.R. 544 (Bankr.S.D.Fla.1985); *Armstrong v. Rainier Financial Services (In re Greiner),* 45 B.R. 715 (Bankr.N.Dak.1985). Consequently, the power of a debtor to reel persons from all over the globe into a single forum "should be abrogated when the greater relative inconvenience shifts to the defendant." *In re WWG Industries, Inc.,* 44 B.R. at 290. Congress has determined by enacting 1409(d) that the "greater relevant inconvenience" has shifted in favor of Appellants regarding the assertion of Appellee's post-petition claims against them. Proper venue must be determined with reference to applicable nonbankruptcy venue provisions.

### 3. *Applicable Nonbankruptcy Venue Provisions*

Continental filed an adversary proceeding pursuant to 11 U.S.C. § 542, which is

26. *Johnson Creative Arts v. Wool Masters,* 743 F.2d at 951, cited by Appellee in support of its argument regarding personal jurisdiction, reinforces the teaching of *Leroy.* Citing *Neirbo v. Bethlehem Shipbuilding Corp.,* 308 U.S. 165, 168, 60 S.Ct. 153, 154, 84 L.Ed. 167 (1939), the First Circuit first set forth its view of the function of venue as follows: "Venue, though a statutory requirement, is based on Congress' decision concerning where a case *should* be heard. It is a privilege given to the defendant primarily as a matter of convenience and is not based on an inherent power of a particular court over the parties." Then, the Court concluded that due process analysis, which measures the minimum amount of fairness required by the Constitution for the exercise of personal jurisdiction, is distinct from the analysis of the fairness factors involved in the determination of power venue. Thus, the Court stated:

> The fact that a particular court's assertion of personal jurisdiction is not so "unfair" as to deny a defendant due process does not necessarily mean that to hold trial there is "fair" in the sense contemplated by Congress in the venue statute. The two concepts are independent of each other and must be interpreted with their respective underlying objectives and rationales in mind.

the subject of an appeal pending before this Court.[27] Continental charged the defendants, who are all residents of N.M.I.,[28] with acting and conspiring to deprive Continental of an "equitable interest" in 9,000 shares of UMDA. The 9,000 shares are of pivotal importance in Continental's takeover of UMDA because they may represent the controlling interest.

■ Ignoring, for the moment, the linchpin of Continental's theory of this case, this Court determines that Continental possessed no legal or equitable interest in the 9,000 shares at the time of filing bankruptcy. Therefore, the doctrine of relation-back is not at issue. All events of operative significance occurred subsequent to Continental's filing bankruptcy; Continental's claims against Appellants unquestionably arose after the commencement of its title 11 case. Accordingly, subsection 1409(d) mandates that venue is to be determined by 28 U.S.C. § 1391(b).[29]

■ Pursuant to 1391(b), venue is proper in the district where all of the defendants reside. All of the defendants reside in the N.M.I. Thus, venue is proper in the United States District Court (N.M.I.) under the first test specified by 1391(b). Venue is also proper in the district where the "claim arose."

■ Subsequent to the amendment of 1391(b), a number of traditional tests have been formulated to aid courts in determining the situs of a claim's origin.[30] Regard-

---

**27.** Although this Court expresses no viewpoint on the merits of Continental's turnover complaint, for venue purposes, this proceeding rests upon federal question jurisdiction. Section 542 provides in relevant part as follows:

> **§ 542. Turnover of property to the estate**
>
> (a) Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

Temporary restraining orders and preliminary injunctions entered in this proceeding, *Continental v. UMDA, Tenorio, Hillblom, and Utley*, are the subject of appeal in Civil Action No. 85-4548.

**28.** Continental's complaint alleges that Tenorio and Hillblom are residents of N.M.I. As already noted, the Bankruptcy Court (N.M.I.) has found that UMDA is a N.M.I. corporation. Additionally, Continental's complaint alleges that the present whereabouts of Utley are unknown but that he is a "former resident" of N.M.I. Thus, the N.M.I. Court is left the task of entertaining venue objections if asserted by Utley pursuant to 28 U.S.C. § 1391(b).

**29.** 28 U.S.C. § 1391(b) provides as follows:

> (b) A civil action wherein jurisdiction is not founded solely on diversity of citizenship may be brought only in the judicial district where all defendants reside, or in which the claim arose, except as otherwise provided by law.

Prior to amendment in 1966, venue in federal question cases was strictly limited to the district where all defendants resided. *See Smith v.*

*Lyon,* 133 U.S. 315, 10 S.Ct. 303, 33 L.Ed. 635 (1890). The amendment was enacted to fill the anomalous gap in cases where multiple defendants resided in different districts, and there was no proper venue despite the existence of federal jurisdiction. *See Brunette Machine Works, Ltd. v. Kockum Industries, Inc.,* 406 U.S. 706, 710 n. 8, 92 S.Ct. 1936, 1939 n. 8, 32 L.Ed.2d 428 (1972). However, the Supreme Court in *Leroy v. Great Western* has unequivocally cautioned against interpreting the amendment to find venue in any of the multitude of districts in which some part of the alleged wrong, no matter how small, took place.

**30.** Several of the traditional tests for determining proper venue pursuant to the amendment of 28 U.S.C. § 1391(b) are stated in the following cases: *Clayton v. Prudential Ins. Co. of America,* 554 F.Supp. 628 (S.D.Tex.1982) (accessibility of witnesses and records); *Sutain v. Shapiro & Lieberman,* 678 F.2d 115 (9th Cir.1982) (substantial part of events giving rise to the claim); *United States Fidelity & Guaranty Co. v. Alexander,* 463 F.Supp. 687 (D.Ga.1979) (aggregate of operative facts); *Commercial Lighting Products, Inc. v. United States District Court,* 537 F.2d 1078 (9th Cir.1976) (significant contacts); *Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp.,* 291 F.Supp. 252 (E.D.Pa.1968) (weight of the contacts test). Since Continental's estate does not have control or possession of the "Utley shares" within the meaning of 11 U.S.C. § 362(a)(3), there is scant basis for finding that a violation of the automatic stay has occurred. However, even if such a violation had occurred, as Appellee claims, the argument that Appellee's cause of action arose in Texas, because that is where the automatic stay was violated, is unpersuasive. The scope of the automatic stay extends nationwide. The

less of which of these tests were to be applied to the facts in this case, the conclusion is inescapable that no predicate has been laid for venue in this district. Appellants' contacts with this district appear to be miniscule; there has been no voluntary waiver of venue objections. Continental's claims cannot reasonably be found to have arisen in this district for purposes of 1391(b). Accordingly, in the interest of justice and for the convenience of the parties and witnesses, Continental's turnover complaint is transferred to the United States District Court (N.M.I.) where it could have been initially filed.

## V. *The Certification of Contempt*

On July 8, 1985, the Bankruptcy Court (Texas) entered its Order which decreed that Appellant, Hillblom, had repeatedly, willfully, and knowingly defied its orders and adjudged him to be in contempt of court.[31] Appellee contends that this proceeding to enforce the automatic stay by means of civil contempt was a core proceeding within the meaning of 28 U.S.C. § 157, and thus within the scope of the bankruptcy court's powers. *See Better Homes of Virginia, Inc. v. Budget Service Co.*, 52 B.R. 426 (E.D.Va.1985). Since Appellee asserts that the Bankruptcy Court (Texas) both adjudicated Hillblom in contempt, and certified its findings and conclusions, this Court must address the question of whether a bankruptcy judge may exercise the power of judicial contempt within the limitations imposed by the Constitution. Relying upon *In re Cox Cotton Co.*, 24 B.R. 930 (E.D.Ar.1982), and *Lindsey v. Ipock, Louis Co., Inc.* (*In re Omega Corp.*), 51 B.R. 569 (D.C.C.1985), which squarely address the constitutionality of the exercise of contempt power by the bankruptcy judge, Appellant contends that the *Marathon* decision requires the contempt power to be characterized as judicial in nature, and prevents its exercise by a non-Article III official.

This Court concludes that a contempt hearing is not a core proceeding, and that Appellant is entitled to review upon a *de novo* standard. Since the injunctive orders entered by the Bankruptcy Court (Texas) were improvidently granted, premised upon an improper application of the automatic stay, and may not serve as the basis for an adjudication of contempt, this Court vacates the underlying injunctive orders. Consequently, neither the numerous objections[32] asserted by Appellant in oppo-

fiction that the automatic stay may be violated only in the district in which the title 11 case is pending, as applied to a post-petition cause of action, contradicts the teaching of the Supreme Court in *Leroy*, ignores these traditional tests for determining proper venue, and renders 28 U.S.C. § 1409(d) a nullity by placing the venue decision exclusively within the control of the debtor without regard to the convenience of the litigants or the witnesses.

**31.** The Order of Contempt directed Hillblom to perform the following actions:

3. Hillblom, his agents, employees, servants, attorneys, and all persons in active concern or participation with him shall take such action as is necessary to cause and effectuate within ten business days of the date hereof:

(a) the dismissal without prejudice of each of Hillblom's and POM's claims against any defendant in the Mariana Islands suit;

(b) the vacation of the default judgment obtained against UMDA in the Mariana Islands suit;

(c) the dismissal of POM's Chapter 11 petition in the NMI Bankruptcy Court;

(d) the dismissal without prejudice of POM's adversary proceeding against UMDA in the NMI Bankruptcy Court; and

(e) the vacation of any outstanding orders and any judgment obtained in POM's adversary proceeding against UMDA in the NMI Bankruptcy Court.

**32.** Hillblom raises numerous objections in opposition to the certification of contempt: (1) his actions did not violate the automatic stay or the injunctive orders premised on the automatic stay; (2) the injunctive orders are premised upon an improper application of the automatic stay and may not serve as the basis for contempt; (3) the proceedings below were so biased and prejudiced as to constitute a denial of due process; (4) the contempt order is so replete with improper evidentiary findings and unsupported factual statements that it cannot withstand scrutiny under a *de novo* standard; (5) the Court relied upon authorities cited by Appellee which are clearly distinguishable and have no import upon the proceedings below; (6) the Contempt Order was not the result of the Court's independent reasoning but resulted

sition to the certification of contempt, nor Appellee's arguments in favor of the certification will be considered.

In *Cox Cotton*, 24 B.R. at 930, the bankruptcy judge, after a contempt hearing, entered an order imposing substantial monetary penalties. On appeal, the defendants argued that the exercise of contempt power by a non-Article III bankruptcy judge was unconstitutional. In an exhaustive and scholarly treatment of the issue, Judge Eisele agreed. The court first concluded that the contempt power was an essential attribute of the judicial power conferred by Article III of the Constitution on the federal courts. *Id.* at 945–957. The court ultimately held that the contempt power, as an essential attribute of Article III judicial power, could not constitutionally be conferred upon the non-Article III bankruptcy courts. *See Id.* at 956. In reaching its conclusion, the court emphasized that the exercise of contempt power involves decisions regarding the fundamental rights of individuals, which lie within the unique expertise of the constitutionally protected Article III judge. Reiterating the position of the Supreme Court in *Marathon,* the court also rejected the argument that a right of appeal to an Article III court was sufficient to render the exercise of contempt power by the bankruptcy court consistent with constitutional limitations.

In *In re Omega Equipment Corp.*, 51 B.R. at 569, the United States District Court reversed a contempt order entered by the bankruptcy court based on its conclusion that the Bankruptcy Amendments Act of 1984 could not constitutionally be construed as vesting the non-Article III bankruptcy courts with contempt power. The district court first rejected the debtor's argument that the bankruptcy court's contempt citation was entered in a "core" proceeding, and subject only to review under the clearly erroneous standard. Thus, the court stated:

> The Bankruptcy Act makes clear, however, that "core" proceedings relate directly to the administration of the debtor's estate. 28 U.S.C. § 157(b)(2)(A)–(O); *see also Marathon,* 458 U.S. at 71 [102 S.Ct. at 2871] ("core" of federal bankruptcy power defined as "the restructuring of debtor-creditor relations"). Trial of a contempt charge is not a restructuring of the debtor-creditor relation. It entails a wholly collateral factual inquiry into an alleged contemnor's knowledge, conduct and intent. Moreover, if the "clearly erroneous" standard were to apply, a bankruptcy court would be possessed of the power to enforce all of its own determinations immune from any meaningful review by an Art. III court.

*Id.* at 573–74.

The district court also concluded that the contempt power was an essential attribute of the judicial power vested by the Constitution solely in Article III courts.[33] To avoid a direct decision of the constitutional issue, the court held as follows:

> The Court concludes that as is the case with U.S. magistrates and other non-Art. III adjudicative officers, bankruptcy judges at present cannot be, and have not been, endowed with contempt power, but rather, in matters of contempt are

from *ex parte* communications between Appellee and the Court in violation of Bankruptcy Rule 9003, and (7) compliance represents an insurmountable task because the Order directs Appellant to vacate final judgments of the Bankruptcy Court (N.M.I.), whereas relief from judgment can only be obtained upon motion in accordance with Rule 60(b), FED.R.CIV.P., and because the Order directs Appellant to dismiss a shareholders' derivative class action lawsuit, which requires notice and hearing, and is within the sole discretion of the District Court (N.M.I.). Although these objections will not be discussed in detail, a review of the record substan-

tiates the conclusion that alternative grounds for reversal exist.

**33.** The Ninth Circuit has reached conclusions similar to those reached in *Cox Cotton* and *Omega Equipment* in *Pacemaker Diagnostic Clinic v. Instromedix,* 725 F.2d 537 (9th Cir.1984) (en banc), which upheld the constitutionality of 28 U.S.C. § 636(c) of the United States Magistrates Act. In addition, the court clearly indicated its view that the contempt power is an essential attribute of Article III authority when it stated: "Article III authority is preserved in other respects. District courts retain the power to adjudge a party in contempt." *Id.* at 545.

limited to the submission of proposed findings of fact and conclusions of law to the parent federal district court, with a final adjudiction of contempt to emanate, if at all, from the district judge following de novo review.

*Id.*

■ Although the leading commentator on bankruptcy notes that nothing in the 1984 amendments addresses the exercise of contempt power by the bankruptcy judge, *Collier* echoes the previously cited authorities.[34] Finally, though not controlling here, this Court's independent determination is buttressed by the *Preliminary Draft of Proposed Bankruptcy Rules* (1985). The proposed rules recommend the amendment of present Rule 9020 to require that a motion for contempt be filed in the district court, and limits a *sua sponte* motion to certification of facts to the district court. In either case, proposed Rule 9020 dispels any lingering notions that a contempt pro-

ceeding is a core proceeding.[35] To the extent that the contempt order entered against Hillblom purports to be a final order, it is determined to be inconsistent with the constitutional limitations imposed upon the authority of the Bankruptcy Court and is therefore reversed.

## VI. *The Applicability of the Automatic Stay to Pre-Petition Claims*

The automatic stay provision is one of the fundamental procedural protections afforded to debtors by the Code. 11 U.S.C. § 362(a). The two critical purposes underlying section 362(a)—debtor protection and creditor protection—are explained in legislative history.[36] Legislative intent in enacting the automatic stay is clear; Congress wanted to stop collection efforts for antecedent debts. Congress meant for the debtor to obtain a fresh start free from the immediate financial pressures that caused

**34.** *Collier* states as follows:

The inherent or authorized power of bankruptcy judges to punish for contempt is even less under the 1984 legislation than it was under the 1898 Bankruptcy Act, which recognized that the referees had certain rights to punish for contempt. One suspects that ... the contempt powers of the bankruptcy judges will be severely circumscribed by either the Supreme Court in promulgating new rules, or by the district courts in their orders of reference.

1 *Collier* ¶ 3.01.

**35.** Present Rule 9020 permits the bankruptcy judge to punish summarily for criminal contempt if the judge "saw or heard the conduct constituting the contempt and it was committed in his actual presence." The bankruptcy judge, further limited by 28 U.S.C. § 1481, could exercise the power of criminal contempt after notice and a hearing. The Bankruptcy Rules do not specifically address the imposition of civil contempt sanctions, which has been determined by reference to decisional law. However, Proposed Rule 9020 makes it clear that the bankruptcy judge may not exercise the contempt power, and provides in relevant part as follows:

(a) MOTION IN DISTRICT COURT. A motion for contempt shall be filed in the district court and served on the party named in the motion.

(b) CERTIFICATION TO DISTRICT COURT. If it appears to a bankruptcy judge that contempt has occurred, the judge may certify the facts to the district court.

The Committee Note states: "Bankruptcy judges are judicial officers of the district court, 28 U.S.C. § 151 and 152(a)(1), and there is no statutory authority for them to exercise the contempt power ... The rule applies to civil and criminal contempt proceedings. Bankruptcy judges may, however, impose sanctions, other than contempt ..."

**36.** Congress explained the first purpose underlying the automatic stay as follows:

It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassments, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.

S.Rep. No. 95–989, 95th Cong., 2d Sess. (1978), *reprinted in,* 1978 U.S.Code Cong. & Ad. News 5787, 5840–41. Congress explained the second purpose underlying the automatic stay as follows:

The automatic stay provides creditor protection. Without it, certain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors. Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally.

*Id.* at 5835.

it to go into bankruptcy. "The stay is designed to be a defensive shield, affording the debtor the much needed 'breathing space' that he presumably lacked during the period immediately preceding the filing of the bankruptcy petition. However, the stay is not designed to be an offensive weapon ..." *Turner Broadcasting System, Inc. v. Sanyo Electric, Inc.*, 33 B.R. 996 (N.D.Ga.1983). The second critical legislative purpose, creditor protection, is served by preventing a chaotic and uncontrolled scramble among creditors claiming the debtor's assets.

Despite the broad scope of the automatic stay, it is not all-encompassing. Subsection 362(a)(1) [37] prevents the commencement or continuation of actions that were or could have been commenced against the debtor before it filed a bankruptcy petition. "Proceedings or claims arising post-petition are not subject to the automatic stay." *Avellino & Bienes v. M. Frenville Co., Inc., (In re Frenville Co., Inc.)*, 744 F.2d 332 (3d Cir.1984). "The stay simply does not apply to post-bankruptcy events." *Holland America Insurance Co.*, 777 F.2d at 996.

 The entire thrust of Appellants' complaint focuses upon claims which arose *after* the date of Appellee's Chapter 11 petition from alleged torts committed in connection with Continental's attempt to takeover UMDA. Nevertheless, Continental urges that Appellants have been properly stayed from pursuing their cause of

action by virtue of subsection 362(a)(1) because the complaint filed in the N.M.I. seeks an accounting. Although an accounting which ordered the *payment* of an antecedent debt might constitute a violation of the automatic stay, and threaten interference with this district's exclusive jurisdiction over the debtor's estate, Appellants assert that Continental's failure to render a proper accounting to Air Mike, both pre-petition and during the pendency of the bankruptcy proceedings, has damaged the creditworthiness of UMDA, and artificially depressed the price of its stock so that Continental could purchase on the basis of undisclosed inside information. Thus, Appellants contend that an accounting is sought not for the purpose of recovering payment of a pre-petition debt but to aid the court in assessing damages which flow from a cause of action that accrued post-petition, and which is not stayed by subsection 362(a)(1). *See In re Frenville*, 744 F.2d at 332.

The obvious purpose of Appellants' shareholders' derivative suit is to vindicate the property rights of the target corporation, rather than to obtain a favorable position *vis a vis* Continental's creditors. The Bankruptcy Court (Texas) makes no attempt to limit its orders to those claims which are arguably stayed by subsection 362(a)(1). Rather, the underlying orders sweep broadly to forestall the prosecution of a post-petition cause of action. More-

---

**37.** 11 U.S.C. § 362(a)(1) provides as follows:

**§ 362. Automatic stay**

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970 (15 U.S.C. 78eee(a)(3)), operates as a stay, applicable to all entities, of—

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

Several policy reasons support the conclusion that the automatic stay is generally inapplicable

to post-bankruptcy proceedings. The debtor is expected to conduct its business in accordance with local law; it is fundamentally unfair to permit a debtor to commit torts in the operation of its business and hide behind the automatic stay. *See* 28 U.S.C. § 959. "In addition, courts have reasoned that since claims arising after a bankruptcy petition is filed are not dischargeable, there is no valid reason for invoking section 362(a) and halting the prosecution of these cases." *Turner Broadcasting System, Inc.*, 33 B.R. at 1000. Finally, the important goal of bankruptcy—successful corporate reorganization—would be severely undermined if the automatic stay precluded suits arising after bankruptcy since individuals would be reluctant to conduct business with debtors if they were not suable as other entities. *See* 2 *Collier* ¶ 362.04, at 362–28.

over, the District Court (N.M.I.) is competent to determine the scope of protection afforded by the automatic stay. *See In re Baldwin-United Corp. Litigation,* 765 F.2d 343, at 347–48. This Court concludes that the proceedings instituted by Appellants fall outside the explicit limits of 11 U.S.C. § 362(a)(1), and do not inflict the type of harassment that the automatic stay was designed to prevent.

### VII. *The Applicability of the Automatic Stay To Property Acquired Post-Petition*

Continental also urges that Appellants have been properly stayed by virtue of subsection 362(a)(3) which forbids "any act to obtain possession of property of the estate or property from the estate." [38] Nowhere in this extensive appellate record does Appellee precisely identify the property threatened by Appellants' alleged violation of subsection 362(a)(3). However, this Court discerns the linchpin of Continental's theory to be as follows: After-acquired interest in property becomes property of the debtor's estate pursuant to 11 U.S.C. § 541(a)(7); [39] the automatic stay provisions of subsection 362(a)(3) protect the estate's after-acquired interest in property, and Appellant's institution of proceedings in violation of the automatic stay interferes with this district's exclusive jurisdiction over the debtor's estate. 28 U.S.C. § 1334(d).

There are several reasons why Continental's theory must be rejected as applied to the circumstances in the case at bar. First, this Court concludes that the commencement of proceedings in the N.M.I. did not seek to "obtain" property of the estate within the meaning of subsection 362(a)(3). [40] Both parties cite the Fifth Circuit's opinion in *Holland America Ins. Co.,* 777 F.2d at 992, in support of their arguments regarding the applicability of § 362(a)(3). To the extent that *Holland America* can be stretched to apply to the circumstances involved in the instant appeal, like the filing of the interpleader action therein, the commencement of Appellants' lawsuit did not have as its object the obtention of property of the estate. Given its limited holding, *Holland America* certainly cannot be stretched to support the proposition advanced by Appellee—that the home bankruptcy court possesses exclusive jurisdiction to determine conflicting claims to property, and that the commencement of proceedings in another district therefore constitutes a violation of the automatic stay. Second, Appellee misconstrues the purpose of subsection 362(a)(3). In brief, the purpose of that subsection is to protect the estate from direct action taken by creditors against a debtor's real or personal property, and to prevent an uncontrolled scramble to liquidate the estate. Subsection 362(a)(3) does not impose a mini-stay applicable to post-bankruptcy events which

---

**38.** Pursuant to § 553(a) of P.L. 98–353, 11 U.S.C. § 362(a)(3) now reads as follows: "any act to obtain possession of property of the estate or property from the estate, *or to exercise control over property of the estate,*" (emphasis added) Although Appellee contends that Appellants' lawsuit represents an attempt "to exercise control over property of the estate," this additional language is inapplicable to bankruptcy cases filed prior to October 8, 1984.

**39.** 11 U.S.C. § 541(a)(7) provides as follows:
§ 541. **Property of the estate**
(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:
(7) Any interest in property that the estate acquires after the commencement of the case.

**40.** In *Holland America,* the Fifth Circuit found that the right to collect proceeds from a fire

insurance policy was property of the estate pursuant to 11 U.S.C. § 541(a)(6), which includes "proceeds, product, offspring, rents or profits from property of the estate." 777 F.2d at 996. Although the debtor's right to collect proceeds did not arise until after the filing of bankruptcy, the debtor had a prepetition contractual interest in the insurance policy at issue. Thus, the mere availability of a fraud defense to payment on the insurance policy did not divest the bankruptcy court of jurisdiction over the estate's interest in property. *See id.* In contrast to the clearly identified interest at stake in *Holland America,* the debtor here has not precisely identified the property which is alleged to have been the object of a § 362(a)(3) violation. Consequently, the finding that a violation of that section has occurred must be considered premature, at best.

incorporates all of the procedural protections of 362(a)(1). Appellee's interpretation conflicts with legislative history and purposes, overlooks relevant provisions of title 28, and obliterates the explicit distinction between causes of action arising against the debtor before and after bankruptcy. Finally, this Court concludes that Continental's effort to funnel the controlling interest in UMDA into the debtor's estate via the "trickle-in" provisions of 11 U.S.C. § 541(a)(7), and the subsequent enforcement of the automatic stay provisions against the minority shareholders of the target corporation, conflicts with the equitable principles that pervade bankruptcy administration.

The commencement of a bankruptcy case creates an estate which is comprised of all of the following property, wherever located: ... "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Although subsection 541(a)(1) could be interpreted to limit the estate to those interests of the debtor in property at the time of filing of the petition, it is properly viewed as a "definition of what is included in the estate, rather than as a limitation." *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 201, 103 S.Ct. 2309, 2311, 76 L.Ed.2d 515 (1983).

The emphasis on defining the estate as of the date the case was commenced applies to 541(a)(1) and (2), but the general timing restriction of section 541(a) does not apply to subsection 541(a)(7). "Section 541(a)(7) has been newly added under the Code. It provides for the inclusion in the estate of any interest in property which is acquired by the estate after the case is commenced." 4 *Collier* ¶ 541.20, 541.95. Subsection 541(a)(7) brings into the estate "every such interest that is not covered by a specific statutory provision mandating some other treatment." *In re Wilson*, 694 F.2d 236, 238 (11th Cir.1982). Consequently, the automatic stay bars certain actions against property of the estate whenever it

is acquired. If the property is property of the estate as that term is defined by § 541(a), including (a)(7), then the stay applies to that property, and a violation of subsection 362(a)(3) is committed if a creditor takes action against property of the estate whether the debt arose before or after the filing of the bankruptcy petition. *See, e.g., In re Northern Acres, Inc.*, 52 B.R. 641 (Bankr.E.D.Mich.1985); *In re Johnson*, 51 B.R. 439 (Bankr.E.D.Pa.1985).

Appellee's contention that after-acquired property becomes property of the estate pursuant to subsection 541(a)(7) is well-founded. However, the explicit language of the Code, legislative history, and case law reveals scant support for the proposition that subsection 362(a)(3) bars the commencement or continuation of Appellants' post-petition cause of action. Although the definition of property for purposes of the Code is broad, and encompasses all kinds of property, including tangible and intangible property, choses in action, and causes of action, subsection 362(a)(3) does not bar every proceeding hostile to a debtor's claimed interest in property, no matter how intangible, unmatured or unliquidated the debtor's claim, and no matter how indirect the attack upon the estate's interest in property. The commencement of proceedings based upon a post-petition cause of action against the debtor is generally not encompassed by subsection 362(a)(3), even when a substantial claim adverse to the debtor's claimed interest in property is asserted which might ultimately establish that the estate has no legal or equitable interest in the claimed property. The contrary interpretation would run counter to the pervasive distinction between pre and post-bankruptcy events, and would render subsection 362(a)(1) generally coextensive with, and superfluous to, 362(a)(3).

Legislative history sheds some light on the intended scope of subsection 362(a)(3).[41] Although the Code unquestion-

---

**41.** The House Report on the Bankruptcy Reform Act states as follows:

Paragraph (3) stays any act to obtain possession of property of the estate (that is, property

ably abolished the distinction between summary and plenary jurisdiction, the legislative reference to "property over which the estate has control or possession" retains the flavor of the summary-plenary dichotomy of pre-Code law, and militates against the expansive interpretation of this provision which is urged by Appellee. Although this Court does not hold that the scope of subsection 362(a)(3) is precisely limited to instances where a creditor is taking direct action against a *res* in the hands of the debtor, there is no reason to adopt a strained interpretation which ignores legislative purpose. At its core, the interpretation of section 362 involves questions of federal preemption and supremacy. Thus, while seemingly broad in scope, the automatic stay provisions should be construed no more expansively than is necessary to effectuate legislative purpose.

Cases interpreting subsection 362(a)(3) have generally involved direct action taken by creditors against a debtor's personal or real property. Moreover, courts have clearly distinguished between the entry of judgment, and attempts to enforce a judgment against property of the estate when determining whether a violation of subsection 362(a)(3) has occurred. *See, e.g., Borg-Warner Acceptance Corp. v. Hall*, 685 F.2d 1306 (11th Cir.1982) (attempt to exercise self-help, repossession or detinue under state court proceedings); *In re Carr*,

52 B.R. 250 (E.D.Mich.1985) (enforcement of liens, attachments of liens, execution against real property); *In re McNeely*, 51 B.R. 816 (Bankr.D.Utah 1985) (attachment proceedings); *In re Tel-a-Communications Consultants, Inc.*, 50 B.R. 250 (Bankr.D.Conn.1985) (repossession of vehicle); *In re Zartun*, 30 B.R. 543 (Bankr. 9th Cir.1983) (repossession of personal property).

■ After consideration of the foregoing authorities and legislative history, this Court is not persuaded that the interests of the debtor are impinged by the lawsuit filed by Appellants within the meaning of subsection 362(a)(3). However, even if the N.M.I. proceedings had been properly barred by the automatic stay, a decision to modify or enforce the stay involves a largely factual inquiry which requires the court to balance the opposing equities and apply common sense. Courts have regarded the opportunity to litigate the issue of liability as a significant right which cannot be easily set aside, even when prepetition causes of action are involved. *See, e.g., In re Bock Laundry Machine Co.*, 37 B.R. 564 (Bankr.N.D.Ohio 1984) ("The automatic stay was never intended to preclude a determination of tort liability and the attendant damages. It was merely intended to prevent a prejudicial dissipation of a debtor's assets.")[42] The declaratory

of the debtor as of the date of the filing of the petition) or property from the estate (property over which the estate has control or possession). The purpose of the provision is to prevent dismemberment of the estate. Liquidation must proceed in an orderly fashion. Any distribution of property must be by the trustee after he has had an opportunity to familiarize himself with the various rights and interests involved and with the property available for distribution.
H.Rep. No 95–595, 95th Cong.2d Sess., *reprinted in*, 1978 U.S. Code Cong. & Ad. News 6298. To the extent that Continental premises its 362(a)(3) argument upon its interest in the Statement of Principles, this argument appears to be moot in light of Appellee's abandonment of its interest in the agreement. Keeping in mind the principle that the automatic stay does not insulate a debtor from liability arising postpetition, but only is intended to provide protection for property of the estate, the contention

that Appellant's commencement of proceedings represents a violation of the automatic stay is misplaced. Continental also argues that Appellants' request for injunctive relief constitutes a violation of 362(a)(3). However, that argument may be advanced before the District Court (N.M.I.), which is competent to determine the applicability of the automatic stay. Moreover, it seems that the injunctive relief requested could only be premised upon an initial judicial determination that Continental's estate possesses no equitable interest in the claimed property. In sum, this district does not have exclusive jurisdiction to determine the viability of all conflicting claims to property. 28 U.S.C. § 1334(b).

42. Legislative history states as follows:
 Generally, proceedings in which the debtor is a fiduciary, or involving post-petition activities of the debtor, need not be stayed because they bear no relationship to the purpose of the automatic stay, which is debtor protection from creditors.

judgment entered by the Bankruptcy Court (N.M.I.), which this Court does not regard as a violation of the automatic stay, sharply focuses on the relevant equitable factors.[43] In sum, a bankruptcy court must be guided by equitable principles in exercising its discretion to enforce or modify the automatic stay.[44] *See Matthews v. Rosene*, 739 F.2d 249 (7th Cir.1984).

## VIII. *Equitable Relief*

Appellants urge the applicability of 28 U.S.C. § 959,[45] which authorizes lawsuits against debtors-in-possession with respect to any of their acts or transactions in carrying on business. In response, Appellee cites *In re Fidelity Mortgage Investors*, 550 F.2d at 47, for the proposition that debtors are only suable for the "routine occurrences" which arise from efforts to continue carrying on business. *Id.* at 56.

Although the Second Circuit in *In re Fidelity Mortgage Investors* concluded that the "evident purpose of § 959 is to enable a debtor-in-possession to continue his business," *Id.*, section 959 has also been

traditionally viewed as an exception to the automatic stay which is intended to permit actions redressing torts committed in furtherance of the bankrupt's business operation. *See, e.g., Haberern v. Lehigh & N.E. Ry. Co.*, 554 F.2d 581, 585 (3d Cir.1977); *Matter of American Associated Systems, Inc.*, 373 F.Supp. 977 (E.D.Ky.1974). Thus, Congress has explicitly expressed its intention that a debtor is not to have *carte blanche* authority to ignore nonbankruptcy law. 28 U.S.C. § 959(b). *Fidelity Mortgage Investors*, cited by Appellee, is not inapposite, since the Second Circuit found that the suit filed by the creditors in that case was for the purpose of enhancing their position in the reorganization proceedings, rather than to redress torts occurring in the post-petition operation of the debtor's business. *Id.* at 57.

■■■ It has been held that 28 U.S.C. § 959 creates an express exception to the automatic stay imposed by section 362(a). *See, e.g., In re Campbell*, 13 B.R. 974, 976 (Bankr.D.Idaho 1981). The better view is

H.R. Rep. No. 95–595, 95th Cong., 1st Sess. (1977), *reprinted in* 1978 U.S. Code Cong. & Ad. News 6300.

**43.** The N.M.I. Court held that the following conduct engaged in by UMDA was both unlawful and against public policy: (1) allowing members of UMDA's board of directors to be represented by or vote by proxy; (2) conspiring with Continental to allow Continental to acquire more than forty percent of UMDA stock in violation of UMDA's Articles of Incorporation; (3) transferring shares of stock on its books without first receiving an accurate accounting from Continental so that the value of the stock could be ascertained; (4) allowing members of its board of directors to sell their votes, and their fiduciary duty, and (5) allowing directors to vote on matters, motions or proposals when the director's personal and/or pecuniary interests conflicted with the interests of the corporation.

**44.** It is clear that neither the estate nor its creditors may benefit from an interest in property which the debtor does not possess. *See, e.g. United States v. Whiting Pools, Inc.*, 462 U.S. at 206, 103 S.Ct. at 2314 (reiterating the theme, with reference to 11 U.S.C. § 541(d), that, although the scope of the statutory definition of property is broad, the concept of property of the estate is not without limit). In such circumstances, courts of equity may impose a construc-

tive trust as a restitutionary remedy to prevent unjust enrichment. The equitable or constructive trust has been traditionally recognized in bankruptcy, and remains a valid remedy under the Code. *See, e.g., In re N.S. Garrott & Sons*, 777 F.2d 462 (9th Cir.1985); *Matter of Quality Holstein Leasing*, 752 F.2d 1009 (5th Cir.1985); *Georgia Pacific Corp. v. Sigma Service Corp.*, 712 F.2d 962 (5th Cir.1983); *Rosenberg v. Collins*, 624 F.2d 659 (5th Cir.1980); *Schuyler v. Littlefield*, 232 U.S. 707, 34 S.Ct. 466, 58 L.Ed. 806 (1914). Although this Court stops short of determining that an equitable trust is an available remedy to the shareholders of UMDA, the evidence adduced by defendants posed an impediment to Continental's showing of success on the merits required for equitable relief.

**45.** 28 U.S.C. § 959 provides as follows:

**§ 959. Trustees and receivers suable; management; State laws**

(a) Trustees, receivers or managers of any property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property. Such actions shall be subject to the general equity power of such court so far as the same may be necessary to the ends of justice, but this shall not deprive a litigant of his right to trial by jury.

that the statutes can be harmonized.[46] However, the Bankruptcy Court (Texas) essentially relied upon the automatic stay, and did not attempt to harmonize the two statutes, since it adopted the debtor's view that 28 U.S.C. § 959 was inapplicable to the N.M.I. lawsuit. Nevertheless, "the reorganization court may not properly by blanket injunction foreclose the bringing of suits within the terms of section 959." *In re Kish,* 41 B.R. at 622. Although the reorganization court unquestionably retains discretion to enjoin suits filed pursuant to 28 U.S.C. § 959, Congressional intent is to be given effect unless compelling equitable considerations support injunctive relief. The automatic stay cannot be relied upon to vitiate the clear and dispositive legislative decision to allow direct action in suits such as that of Appellants.

■ Section 362 of the Code, which stays actions against the debtor and against property of the estate, does not forbid actions against a debtor's codefendants. Therefore, the sole statutory basis for issuance of a stay against a debtor's codefendants is section 105 of the Code.[47] Under this provision, bankruptcy courts have used injunctive power to provide temporary protection for a debtor's codefendants. *See, e.g., Otero Mills, Inc. v. Security Bank & Trust (In re Otero Mills, Inc.),* 21 B.R. 777 (Bankr.D.N.Mex.), *aff'd,* 25 B.R. 1018 (D.N.Mex.1982). Since the Fifth

Circuit has recently explicated the limited nature of discretionary stays, there is no reason to re-examine this legal area in depth. *See GATX Aircraft Corp. v. N/V Courtney Leigh,* 768 F.2d 711, 715–17 (5th Cir.1985) ("A stay can be justified only if, based on a balancing of the parties' interests, there is a clear inequity to the suppliant who is required to defend while another action remains unresolved and if the order granting a stay can be framed to contain reasonable limits on its duration."); *See also Wedgeworth v. Fibreboard Corp.,* 706 F.2d 541 (5th Cir.1983). Accordingly, injunctive relief in favor of non-debtors must be considered an extraordinary remedy to be granted only when a significant and direct impact on the reorganization proceedings is threatened. The "movant must make out a clear showing of hardship and adverse impact on the reorganization case if there is even a fair possibility that the stay will prejudice an adverse party." *In re Arrow Huss, Inc.,* 51 B.R. 853 (Bankd.D. Utah 1985), *citing, Landis v. North American Co.,* 299 U.S. 248, 255, 57 S.Ct. 163, 81 L.Ed. 153 (1936).

■ Injunctive relief granted pursuant to section 105 must be tested against the standards of Rule 65, Federal Rules of Civil Procedure, which is expressly made applicable to bankrupty proceedings. *See* Bankruptcy Rule 7065. Consequently, an

---

**46.** A framework for analysis which harmonizes the two statutes has been proposed by the leading commentator. *See In re Kish,* 41 B.R. 620, 622 (Bankr.E.D., Mich.1984), *citing,* 1 *Collier* ¶ 3.04[1][b].

**47.** Section 105 of the Code provides in relevant part as follows:
 (a) The Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title.
11 U.S.C. § 105. The bankruptcy court has long been recognized as a court of equity. *See Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939). Although the bankruptcy court should not use its equitable powers to defeat legal rights, it can, and must, use its statutory powers to further its own jurisdiction over the debtor's estate. However, section 105 does not give bankruptcy courts the authority to contravene specific provisions of the Code. In exercising authority pursuant to 11 U.S.C.

§ 105, the bankruptcy court is limited by the express terms of the Code; the court must apply bankruptcy law, not rewrite it. Moreover, the equitable jurisdiction of the bankruptcy court may not be exercised in defiance of expressed rules of law and equity. *See, In re Burley,* 11 B.R. 369, 373 (Bankr.C.D.Cal.1981) ("Equity jurisdiction is as well *defined* and *limited* as that of a court of law. It is not unbridled or unfettered license to fashion relief as seems appropriate to the Chancellor.") (emphasis in original). Thus, this Court, like others, takes a dim view of unbridled reliance upon the Code's extraordinary writ provision. Section 105 is to be relied upon in aid of the bankruptcy court's jurisdiction, but it does not provide a "candy store" which allows the Court to pick and choose among properly promulgated rules which it likes or dislikes. *In re Arnage, Inc.,* 33 B.R. 662 (E.D.Mich.1983).

injunction may issue if the bankruptcy court finds that "irreparable injury would result to the movant in its absence, that the threatened injury to the movant outweighs the harm that the injunction may cause to the nonmovant, that there is a likelihood of success on the merits, and that the public interest would not be adversely affected by the injunction ... Injunctive relief is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing carries the burden of persuasion." *Holland America,* 777 F.2d at 997 (citations omitted).

■ In light of the heavy burden assigned to movants in the proceedings below, this Court concludes that the granting of injunctive relief upon the facts in the instant case cannot withstand even the traditional standard of scrutiny. A review of the record indicates that the four factors required for equitable relief have not been clearly established by the movants.

The injunctions at issue significantly intrude into the state and federal rights of the target's shareholders. This significant intrusion into Appellants' rights must therefore be counterpoised against the interests of the estate. Upon balancing these respective interests, this Court determines that injunctive relief should not have been granted absent a clear and present danger of some significant interference with the debtor's capacity to reorganize or with the functions of the bankruptcy court. While resisting the temptation to rely upon hindsight, numerous intervening circumstances clearly support the conclusion that the commencement and continuation of proceedings in the N.M.I. never presented a sufficient threat of interference with reorganization to justify the sweeping injunctions entered against Appellants.

The Bankruptcy Court (Texas) overreached by imposing a series of stays against Appellants when no clear case of hardship or inequity had been made out by the movants. Considered in their totality, the Bankruptcy Court's orders must be regarded as immoderate in scope and indefinite in duration.[48] Furthermore, the indiscriminate extension of bankruptcy protection in favor of the debtor's numerous codefendants, and the imposition of equitable relief against the debtor's perceived "opponents", cannot be countenanced.

■ This Court takes note here of one more interesting aspect of this appeal. Appellee cites *In re Metal Center, Inc.,* 31 B.R. 458, 462 (Bankr.D.Conn.1983), which states: "Clearly, the debtor's protection (under the automatic stay) must be extended to enjoin litigation against others if the result would be binding upon the debtor's estate." Although the situation at bar bears a somewhat superficial relationship to cases granting injunctive relief in favor of a debtor's guarantors or indemnitees, this Court is not aware of any cases extending injunctive relief to codefendants when suit against the debtor was not barred by section 362(a). Furthermore, the debtor in this case extended offers of indemnification to its codefendants allegedly to induce their cooperation in its post-petition takeover, or in the face of pending or inevitable litigation by the target's shareholders. This Court concludes that such indemnification agreements cannot properly serve as the premise for equitable relief upon the principles stated in *In re Metal Center, Inc.*

Since litigation in the N.M.I. does not present an obstacle to a successful reorganization, it is more just to all of the parties to permit the N.M.I. proceedings to continue in their place of origin in order to leave

---

**48.** The series of injunctions entered in the proceedings below circumvents the Fifth Circuit's admonition against discretionary stays of indefinite duration. Moreover, the extraordinary breadth of the underlying orders is demonstrated in the Certification of Contempt which requires Hillblom and his agents to obtain the express prior approval of the bankruptcy court, after notice and hearing, before they "directly or indirectly initiate, prosecute, finance or otherwise promote any action in any forum except that Court against Continental, Air Micronesia, UMDA, Aloha, the FSM, the Marshall Islands, Palau, or any officer, director, official, agent, employee, servant, attorney, or representative of any of the foregoing."

Appellants to their chosen forum, and to relieve the Bankruptcy Court (Texas) from duties that may be handled better elsewhere. It is unquestionably possible to administer Continental's estate without this district's determination of the parties' rights in this collateral dispute. Moreover, the essentially uncontroverted evidence before this Court on appeal indicates that the equities favor allowing Appellants' lawsuit to continue unabated. This case most definitely does not involve an unseemly race of creditors to the courthouse door.

IX. *Transactions Out of the Ordinary Course of Business*

The parties vigorously dispute the relevance of the Fifth Circuit's recent opinion concerning transactions out of the ordinary course of business.[49] *See Institutional Creditors of Continental Air Lines v. Continental Air Lines, Inc., (In re Continental Air Lines, Inc.)*, 780 F.2d 1223 (5th Cir.1986). There are two discrete aspects of the transactions at issue which arguably fall within the scope of the Fifth Circuit's opinion—first, the marketplace entry for the purpose of acquiring controlling interest in UMDA, and second, the subsequent transactions contemplated by the Statement of Principles.

■ Ironically, this Court relies upon the debtor's own novel theory advanced in *Institutional Creditors*, concerning the use of estate funds in a 363(b) transaction, to reach the conclusion that the use of estate funds in transactions which occurred other than in the ordinary course of business, without prior compliance with the notice and hearing requirements of section 363(b), constitutes a breach of fiduciary duty to the debtor's creditors. Compliance

with the procedural requirements of 363(b) might have limited or avoided the protracted litigation between the parties to this appeal.

A major legislative goal of the Code was to decrease the administrative responsibility of bankruptcy judges so that they could function as impartial arbiters of disputes between the debtor and its creditors. *See* H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 4 (1977), *reprinted in* 1978 U.S.Code Cong. & Ad. News 5787, 5965. ("Because the judge no longer will have to take an active role in managing cases, the bankruptcy court should become a forum that is fair in fact and in appearance as well.") *See also In re Curlew Valley Associates*, 14 B.R. 506 (Bankr.D.Utah 1981) (and authorities cited therein). Concomitantly, creditors were expected to assume increased responsibility for monitoring the debtor's conduct. To these ends, subsection 363(b)(1) requires notice and a hearing *before* the debtor can use estate property in transactions outside of the ordinary course of business so that the objections of creditors and other interested parties can be heard, and to reduce the need for *ex parte* communications between the court and the debtor regarding administration of the estate. In this case, the debtor has misperceived the obvious purpose of 11 U.S.C. § 363(b)(1). The purpose of a 363(b) hearing is to provide a fair forum which allows interested parties to be heard concerning the propriety of contemplated actions—not to provide a favorable forum to determine liability for actions already taken by the debtor. It takes little imagination to reach the conclusion that the debtor's initial marketplace entry should have been subject to the procedural requirements of 363(b). At this point, how-

---

**49.** 11 U.S.C. § 363(b)(1) provides as follows:

§ 363. **Use, sale, or lease of property**
(b)(1) The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.

The Code does not expressly prohibit the takeover of an independent corporation during the course of reorganization. There are, however, extenuating circumstances which render the attempted takeover of UMDA, under the aegis of the Bankruptcy Court (Texas), inconsistent with

the equitable principles that pervade bankruptcy administration. At this point, no attempt is made to ferret out the specific actions taken by Continental as opposed to those taken by its agents. However, the attempt to operate free of the restrictions imposed by the Code, through the activity of the debtor's agents, and the subsequent transferral of assets into the estate in an effort to secure the protections afforded to debtors by the Code, is fraught with conflicts of interest.

ever, this Court does not feel constrained, on balance, to place the interests of estate creditors ahead of the right of the target's shareholders to have this takeover dispute resolved in a convenient forum.

■ The debtor's remaining argument that the underlying injunctions were aimed at preserving the Bankruptcy Court's "exclusive jurisdiction" to review the proposed restructuring of Air Mike must be rejected. For the reasons previously discussed, not only is the Bankruptcy Court (Texas) *not* the only court which may hear the related proceedings arising from Continental's attempted takeover of UMDA, it is not the most appropriate forum.[50] Furthermore, the supposed exclusive jurisdiction of the

Bankruptcy Court is even more attenuated in this case than it would be ordinarily because this district does not possess jurisdiction to authorize critical aspects of the contemplated transactions. Although the debtor remains subject to the notice and hearing requirements of section 363(b), continuing jurisdiction over the terms and conditions of Air Mike's and Continental's route certificates resides in the DOT. *See Pension Benefit Guaranty Corp. v. Braniff Airways, Inc.,* (*In re Braniff Airways, Inc.*), 700 F.2d 935 (5th Cir.1983).[51]

## X. Conclusion

This Court's role on appeal would have been considerably more difficult if this dis-

---

**50.** Appellee argues that the Bankruptcy Court (Texas), pursuant to section 363(b), is not only a fully adequate forum but is, indeed, the only forum which may resolve the dispute between the parties. Appellee's argument might have merited greater attention if the Bankruptcy Court had approved the debtor's initial marketplace entry in connection with a 363(b) hearing. In any event, the contemplated hearing, whether held in connection with the Statement of Principles or the newly proposed agreement with the F.S.M., must be regarded as a most extraordinary "administrative" proceeding. Thus, while it may be contended that the contemplated 363(b) hearing is a core proceeding, pursuant to 28 U.S.C. § 157(b)(2)(M), it seems that *Marathon* requires this Court, and the debtor, to do more than cast about the list of core proceedings stated in section 157 to determine whether the bankruptcy court may dispositively rule in a proceeding; the substantive nature of the underlying claims must first be considered to determine whether they arise in or under title 11. The proceedings filed in the District Court (N.M.I.) are based entirely upon state law, and federal law "regulating organizations or activities affecting interstate commerce," 28 U.S.C. § 157(d). Thus, those proceedings are, at best, "related" proceedings—applying the liberal test set forth by the Third Circuit in *Bobroff,* 766 F.2d at 797.

**51.** It is not entirely clear from the record, and the memoranda submitted by the parties on appeal, whether or not Appellee claims that the routes established in the Pacific Trust Territory, or its route certificate, are property of the estate, and thus the subject of a 362(a)(3) violation. The Fifth Circuit's opinion in *In re Braniff,* while considering only the estate's interest in the debtor's landing slots, is relevant here. The Fifth Circuit expressly rejected the debtor's characterization of landing slots as "property of the estate." *See* 700 F.2d at 942. In contrast to

the Fifth Circuit's opinion, a more recent case concluded that a debtor's landing slots are property of the estate within the meaning of the Code, and that the reallocation of those slots constituted a violation of Section 362(a)(3). *See Matter of American Central Airlines, Inc.,* 52 B.R. 567 (Bankr.N.D.Iowa 1985). The *American Central* court also criticized *In re Air Illinois,* 53 B.R. 1 (Bankr.D.Ill.1985), for its improper reliance on a provision of the Federal Aviation Act which states that "no certificate should confer any proprietary, property, or exclusive right in the use of any airspace, Federal airway, landing area, or air navigation facility. 49 U.S.C. § 1371(i)." *Id.* at 570. Thus, the court concluded that the certificate referred to in section 1371(i), like the certificates at issue in the dispute between Continental and Air Mike, was "a certificate issued by the Civil Aeronautics Board ("CAB")." Furthermore, the court concluded that "the statute only bars the CAB from creating property rights in air space." *Id.* The better reasoned approach may strike a compromise between the positions advanced respectively in *Braniff,* and *American Central,* which recognizes a *limited* proprietary interest for purposes of the Code. Although the task of reconsidering *Braniff* must be left to the Fifth Circuit, the automatic stay provisions should not be extended, either directly or indirectly, to deter private parties from initiating proceedings before the DOT. *See, e.g., Jordan Randolph Mills, Inc.,* 716 F.2d 1053 (4th Cir.1983). Moreover, the public's interest in free airways must, at the very least, be balanced against any proprietary interest in a debtor's "right to fly" which may be found to arise under the Code. Finally, *American Central* does not undermine the Fifth Circuit's conclusion that "the most substantial and persuasive line of authority establishes that any transfer of a state or federal regulatory license or certificate is subject to the continuing jurisdiction and approval of the applicable agency." *In re Braniff,* 700 F.2d at 942.

pute had arisen between the debtor and its own shareholders regarding the right to manage the reorganizing corporation.[52] However, a review of the facts and the applicable law leads to the inescapable conclusion that this district has no legitimate interest under the bankruptcy laws, or otherwise, in injecting itself into the internal management of the target corporation or in abating the litigation of a shareholder's derivative suit maintained by its minority shareholders.

The debtor's repetitive references to "restructuring" are not persuasive in convincing this Court that the concerns in the case at bar are those traditionally pursued in bankruptcy; the proposed "restructuring" bears little relationship to the restructuring of the debtor-creditor relationship, or to the marshalling and preservation of estate assets, which are at the core of bankruptcy administration. In light of the peripheral connection between the instant dispute and ordinary bankruptcy concerns, this Court declines to oust a court which possesses an unquestionably superior knowledge of local law governing the target corporation with the heavy boot of bankruptcy policy.

**52.** *See, e.g., Matter of Lifeguard Industries, Inc.,* 37 B.R. 3, 17 (Bankr.S.D. Ohio 1983) ("There is little question that shareholders of a corporate debtor-in-possession retain their state law rights to control a corporation, and that such rights cannot be lightly cast aside by this Court.")